Filed 9/19/14  P. v. Rawlinson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MYLONNA RAWLINSON, <br><br> Defendant and Appellant. | H039517 <br> (Monterey County <br> Super. Ct. No. SS120158A) |

On February 1, 2013, a jury found Mylonna Rawlinson (appellant) guilty of one count of grand theft.  (Pen. Code, § 487, subd. (a).)  Subsequently, on April 2, 2013, the court sentenced appellant to four years in state prison—the midterm of two years, doubled pursuant to Penal Code section 1170.12, subdivision (c)(1).  Appellant filed a timely notice of appeal.

On appeal, appellant raises only one issue.  Appellant contends that the trial court abused its discretion and thereby "violated [her] federal and state constitutional rights to confront and cross-examine the critical witness against her by preventing [her] from proving the witness's moral turpitude in selling narcotics for profit."  For reasons that follow, we affirm the judgment.

*Evidence Adduced at Trial*

Beth McCray[1] testified that she met appellant at Alcoholics Anonymous.  Later she became appellant's sponsor and they became friends.  They were both recovering

---

[1]     Shortly before trial Ms. McCray married and changed her name to Charbonneau.

addicts.  McCray said that sometime in 2011 she introduced appellant to her 78-year-old mother, Virginia Allen; Allen lived in a home in Seaside.  As a result of the introduction, Allen hired appellant to clean her home.

Sometime in September 2011, upon hearing that some jewelry was missing from her mother's home, McCray confronted appellant about the missing jewelry.  McCray asked appellant if she had taken the jewelry.  At first, appellant denied that she had taken the jewelry, but eventually she admitted that she had.  Appellant told McCray that she had taken the jewelry to a jeweler in Monterey; McCray asked appellant to go to the jeweler and see if she could get the jewelry back.  Appellant left McCray's home.  She returned within half an hour and told McCray that the jeweler had melted down the gold and he no longer had the stones or the gold.

Allen testified that she met appellant through her daughter McCray; she confirmed that she hired appellant to clean her house.  In September 2011, sometime after appellant began cleaning her home, Allen noticed that her wedding band, which was gold with small diamonds, was missing.  She discovered that a gold birthstone ring, a gold nursing pin, and her high school ring, which was gold with an onyx stone, were missing as well.  An insurance company paid her $1,660 for the missing jewelry.

Allen told her daughter about the missing jewelry and learned that appellant had admitted to McCray that she had taken it.  A day or two later she received a telephone call from appellant.  Appellant requested that Allen not file a police report and not use her name, and she said that she would make restitution.  Appellant "kind of asked" Allen "to lie by not using her name, on police reports especially."  Allen testified that by the time she got this telephone call she had already reported the loss to the police.

Allen was unable to identify the specific day on which she first noticed her wedding band was missing; and she could not specifically identify the days that appellant had cleaned her home.  However, Allen testified that appellant was in her home prior to

2

the time she noticed that the jewelry was missing, which was either the day before she filed the police report or the day she filed the police report.[2]

*Defense*

Former Seaside Police Officer Julia Gearhart testified that she investigated Allen's report that some of her jewelry was missing. She telephoned McCray, who told her that the Monterey jeweler that appellant had visited was Jaime Torres. Gearhart showed Torres a photographic lineup of six women, including appellant, but Torres could not identify appellant and did not remember her name. Gearhart asked Torres for an inventory of items he purchased in September 2011. Torres produced two bags of jewelry, but neither bag contained the missing jewelry. Gearhart inspected Torres's ledgers for September, but found no entry matching the missing jewelry. On cross-examination, Gearhart testified that the ledgers were not consistent in the details of the transactions and Torres was unable to produce any ledgers for any month other than September 2011.

The parties stipulated that if Torres testified he would say that after being subpoenaed as a witness, he uncovered a receipt from June 2012 that had appellant's name on it. He recognized appellant as someone with whom he had done business on more than one occasion. Further, he would admit that he had suffered a prior felony conviction for a crime of moral turpitude in 1996.

*Discussion*

As noted, appellant contends that the trial court abused its discretion and thereby "violated [her] federal and state constitutional rights to confront and cross-examine the critical witness against her by preventing [her] from proving the witness's moral turpitude in selling narcotics for profit."

---

[2]     Officer Gearhart established that Allen telephoned the City of Seaside Police Department on September 15, 2011; and that Allen told her she first noticed one of her rings was missing on September 11, 2011.

*Background*

It appears that during his opening statement, defense counsel characterized McCray as a heroin addict and mentioned sales of prescription drugs by McCray.[3] After defense counsel's opening statement, outside the presence of the jury, the prosecutor expressed his "concerns" about defense counsel's opening statement. Essentially, the prosecutor's position was that any evidence that defense counsel had to support his assertions was irrelevant. The court asked defense counsel about the part of his opening statement where he told the jury that McCray illegally sold prescription drugs. The following colloquy took place:

"THE COURT: As far as impeachment of [McCray], you talked about that there would be evidence that she is a drug dealer. And you—does this witness have convictions for drug dealing?

"[DEFENSE COUNSEL]: I'm not aware of a conviction. I'm aware of conduct and I have witnesses to support it.

"THE COURT: And the People, you've received this?

"[PROSECUTOR]: No.

"[DEFENSE COUNSEL]: Cross-examination, your Honor, under Izazaga versus Superior Court, I don't have to provide information used for cross-examination."

The court asked defense counsel what evidence he had. Defense counsel said that he was going to ask McCray "questions. If she denies it, I will impeach her." The court told counsel that McCray had testified and that defense counsel knew what he was "going to impeach her with." The court told counsel that the prosecutor was "entitled to that discovery." Defense counsel told the court that he was being put in a difficult situation;

---

[3] This court has not been provided with the transcript of defense counsel's opening statement. We glean what happened from proceedings that occurred after the prosecutor's direct examination of McCray and before defense counsel cross-examined McCray.

4

counsel asserted that he had asked the court for an opportunity to make an ex parte offer of proof. Counsel told the court that it was "operating in the dark at this point" because the court did not know the information that he had.

The court went on to tell defense counsel, "At this point this witness has testified. You have indicated what you're going to cross-examine the witness on. The People are moving to exclude this information because, A, I believe there is a lack of conviction which you concede and because there is no evidence to support this. So they're moving to exclude this cross-examination." The court asked defense counsel what the evidence he had was to support his assertion that McCray sold prescription drugs.

Defense counsel requested that they discuss the matter in private because he did not want to reveal his strategy. Counsel offered to provide the court with a brief on the discovery issue. Subsequently, counsel submitted briefing in which defense counsel argued that he should be able to impeach McCray regarding her history of drug abuse and drug dealing. Defense counsel's position was that appellant "ha[d] an absolute Sixth and Fourteenth Amendment right to have a meaningful opportunity to present a *complete* defense."

When proceedings continued the next day, the court returned to the issue. The court noted that the People had moved to exclude any reference to the sale of prescription drugs pursuant to Evidence Code section 352; and to exclude any mention of heroin or heroin addiction. The court asked defense counsel if he wanted to "get in any evidence to indicate" that McCray "was involved in the sales of prescription pills." Defense counsel told the court that he wanted the opportunity to provide the court with an offer of proof so the court could see he did have a reasonable basis for asking McCray questions.

The court rejected defense counsel's position that he was not required to disclose impeachment witnesses. Defense counsel told the court that the impeaching information regarding drug sales "relies principally on the statements made by a privileged source, corroborated by another person, who I don't know whether . . . I'm going to call."

5

The court told defense counsel, "The problem is[] that you've indicated in your opening statement this information. You've indicated you want to go into this information. So at this point it's reasonably likely that you intend to call this person. You can't say that at this point it's not reasonable, since you've indicated you're going to present that evidence." Again, defense counsel asked to make an in camera offer of proof. Ultimately, the court allowed defense counsel to make his offer of proof ex parte.

Defense counsel told the court that he had received information from his client about McCray. Counsel told the court that McCray had a prescription for Suboxone, which he explained was a medication for opiate addiction. McCray sold the Suboxone to other people who were members of her support group. Defense counsel said that he had specifics of who purchased it and the price paid. Defense counsel said that this information was corroborated by his client's ex-husband. Counsel told the court that the reason that he was not sure that he wanted to call his client's ex-husband was "because the information he will give may show that one of the people who purchased that medication could be my client."

The court asked defense counsel why, other than the source of the information being from his client, counsel could not have made a proffer in open court. The court explained that its concern was that the People should be allowed to argue relevancy under Evidence Code section 352; the court stated that it had many questions about the information "under 352."

Ultimately, the court ruled that in light of the prosecutor's Evidence Code section 352 objection, defense counsel was required to disclose information that he was going to use to cross-examine McCray; but he did not need to disclose the source of that information. When the prosecutor returned to the courtroom, defense counsel told the court that he wished to cross-examine McCray on "whether [in 2011] she had a large quantity of that medication, or whether she sold it for profit to other people in her support group or outside of [her] support group." Counsel explained that there were "some

6

specifics" that he would ask McCray, such as if she was familiar with a certain transaction for a certain amount or if a certain number of pills were sold for a certain price. The court inquired whether defense counsel was talking about specific events. Counsel said that he did not have "the actual date, but I would give her a description . . . whether she's familiar with a certain person that would buy this much for that much every month, whether she bragged about profits from that transaction to other people, or shared that she engaged in . . . those transactions."

Defense counsel told the court that he did not wish to inquire about McCray's being a heroin addict or her use of controlled substances. Counsel explained, "The only link between use and sales is that she obtains this . . . controlled substance[] that she sells based on her own prescription. That's the only link. [¶] So she gets the substance legally and then deals it to other people in her support group illegally. That's the link." As to the prosecutor's Evidence Code section 352 objection, defense counsel argued that "this is recent conduct showing moral turpitude" and he should be "allowed to question" McCray unless the court found "that the probative value of this information is substantially outweighed by undue prejudice."

The court granted the prosecutor's motion to exclude defense questioning of McCray regarding her use of prescription medications and whether she was or had been addicted to heroin. Specifically, the court found that what "minimal relevance it [has] is clearly outweighed by the prejudice. [¶] The jury already knows that the witness met the defendant through AA or NA. [¶] . . . [¶] Clearly, she's an addict, or otherwise [she] wouldn't be attending AA with your client and wouldn't be a sponsor. And I think the witness would be happy to indicate she's an addict." As to inquiring about the sale of prescription drugs, the court found the alleged conduct was relevant and "does go to impeachment." Further, although the court found that there was some prejudice, "clearly the relevance of conduct involving moral turpitude that's occurred within the last year and a half to two years is highly relevant on [McCray's] credibility."

7

Nevertheless, the court went on to say that with respect to "specific details, events, transactions of those sales, the Court finds that that is prejudicial, time consuming and of minimal or no relevance." In particular, the court would not allow defense counsel to ask McCray whether she remembered "a transaction involving 30 pills for $300 to a certain gentleman that would resupply from you every month . . . ." Defense counsel argued that the court should allow him limited [follow- up] in the event that McCray denied ever selling the pills. The court told defense counsel that in the event McCray denied selling the pills counsel could call witnesses to rebut her statements.

During defense counsel's cross-examination, the following colloquy occurred between defense counsel and McCray:

"Q. In September of 2011, what was your financial situation?

"A. Mine?

"Q. Yes.

"A. Working at Safeway, making about $17 an hour, paying my bills. I've had a bank account for five years now. Never had a bounced check, never had a problem.

"Q. Did you ever supplement your income in any way other than through working at Safeway?

"A. No.

"Q. Did you ever supplement your income, ma'am, by selling prescription medication to other addicts?

"A. I won't say I sold prescription medication to other addicts, but another addict that was on the same medication as I was, we'd swap back and forth if she was out and I had some.

"Q. Did you ever provide certain prescription medication named Suboxone to other addicts in exchange for money?

"A. To one addict.

"Q. Okay.

8

"A.   That would be your client.

"Q.   Okay.  Okay.  Did you—and that was in exchange for money?

"A.   Yes.

"Q.   So you made profit on that transaction; correct?"

The prosecutor entered a relevance objection, which the court overruled.

McCray continued:

"[A.]  I guess you could say that.

"[Q.]  How much profit did you make?"

Again, the prosecutor entered a relevance objection to which the court responded that it would allow "a very, very limited inquiry."  McCray answered defense counsel's question by stating "Not a whole lot."

Defense counsel continued:

"[Q.]  Now you say that you had a so-called sponsor/sponsoree relationship, a relationship of trust with my client; correct?

"A.   Right.

"Q.   And yet you dealt drugs to her essentially using that trust?

"A.   I wouldn't—okay.  If you want to be specific about it, what I was doing was illegal.  She had already—

"[PROSECUTOR]:  Objection.

"[McCRAY]:  She had been on the prescription before.

"[THE COURT]:  Objection is overruled.

"[McCRAY]:  She had been on the prescription.  I had been on it.  I was weaning myself down on it, so I was prescribed more than I was taking.  [¶]  And not that it's right.  She couldn't get them from the doctor anymore because she didn't have the insurance and couldn't afford them.  So I provided them to her.  And they're to detox or keep—maintain you off of opiates.  [¶]  So I wasn't trying to harm her.  I was trying to keep her off of opiates.

9

"Q. And made a profit at it?

"A. Yes."

Defense counsel asked to approach the bench to get "further clarification." After a sidebar discussion defense counsel continued:

"[Q.] Just to clarify, ma'am, the prescription medication we're talking about is Suboxone?

"A. Suboxone. [¶] She had been previously prescribed by her doctor and couldn't afford them anymore.

"Q. Okay. Ma'am, as you're under oath today, true or false; isn't it true that you also sold Suboxone to other people, not just my client?

"A. No. That is false.

"Q. Okay. And you said the money that you did receive from my client, that was beyond just your costs for the medication; was it not?

"A. Slightly.

"Q. Okay. So when you were asked by me a question of whether you were supplementing your income from Safeway in any way and you answered no, that wasn't entirely true; was it, ma'am?

"A. No, it wasn't entirely true. But that didn't dawn on me.

"Q. When you spoke with Officer Gearhart . . . did you ever tell her about your extracurricular activity with respect to Suboxone?

"A. No, I did not, because I didn't see the relevance to this case. She stole jewelry from my mother."

The prosecutor objected. Ultimately, when the court overruled the objection the court told defense counsel to move to the next question.

"Q. So didn't you think it was important for Officer Gearhart when she was taking your word regarding my client's alleged statement to you, you did not think that it

was important for this police officer to know that you were also dealing prescription medication to other people?"

The court sustained the prosecutor's objection.

Out of the presence of the jury, the court placed the contents of two sidebar conferences on the record. The court noted that defense counsel had "wanted to ask follow-up questions on the type of prescription drug involved. There w[ere] two requests. The first request was to ask one particular question, and I did permit that question to be asked. That was after the side bar conference. Initially, I sustained the objection. You asked for a side bar. I then permitted that question to be asked. Is that correct?" Counsel confirmed that the court was correct. The court went on to say, "And then finally, towards the end of [McCray]'s testimony, you wanted to go again into the details of specific transactions that you believed occurred by . . . Ms. McCray . . . for the same reasons as you previously said on the record; is that correct?"

Defense counsel confirmed that the court was correct, but asked to supplement the court's explanation. Defense counsel continued: "I would like to add to that what I would have asked Ms. McCray if I had the chance. Whether it was true that she was also selling it to another gentleman who was a regular customer of hers; that she would receive a total prescription of 90 pills, and that she would sell 30 of those to that gentleman for $300 and that she would do it every month and whether she admitted to other people that she had been selling to him and bragged about it. I think she was minimizing her statement when she said she was only selling it to my client when, in fact, her operation was much larger than that. I was hoping—because the tactic worked and confronting her with her drug dealing activities did elicit an affirmative response, I was hoping that asking her more specific questions about more specific transactions would have elicited likewise an affirmative response. And so I feel that my cross-examination on that subject should have been allowed under the 6th and 14th amendment of the United States [C]onstitution and the case law that I previously cited."

11

The court indicated that it had done "a thorough 352 analysis" during in limine motions. The court went on to say that it had "conducted that 352 analysis a third time after counsel asked to approach the bench and again wanted to go into those details. This evidence was submitted solely for the purposes of credibility. I believe that [the] defense more than sufficiently attacked the witness's credibility with her statements regarding the transactions. The follow-up detailed questions were clearly more prejudicial. I did inform counsel previously as well as at side bar and again in court that the defense is, of course, still permitted to call witnesses to counter that witness's claim. And you can call any witnesses to present any evidence you feel is relevant to support your allegations. At the time I believe at side bar you indicated—well, I'm not sure if you indicated you weren't going to, but I did advise you of your opportunity to call those witnesses."[4]

During his summation, defense counsel argued, without objection, in reference to the jury instruction on how to judge witness credibility, that "we had a witness who on the stand admitted to committing a felony, selling drugs, prescription drugs to a person who in [the prosecutor]'s own words had her trust. She didn't share medications with someone who ran out. She did it for a profit. When she was confronted about it originally and asked if she supplemented her Safeway income as a checker with anything else, she said that she did not. And then she admitted that she was not completely honest, because she did supplement it with my client's—at least my client's—if you believe she sold it to nobody else—money."

Appellant's argument that her confrontation rights were violated is based on her assertion that McCray was "the Principal Witness Against Her." We disagree.

---

[4]     In her motion for a new trial, which the court denied, appellant argued that the trial court's refusal to allow her to cross-examine McCray regarding the specifics of her drug dealing violated her rights under the Fifth, Sixth and Fourteenth Amendments. Appellant claimed that she could not follow the trial court's suggestion to call additional witnesses for unidentified "strategic reasons."

The Sixth Amendment's confrontation clause guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 685-686 (*Van Arsdall*).) " 'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' [Citation.]" (*Davis v. Alaska* (1974) 415 U.S. 308, 315-316, italics omitted.) Nevertheless, neither the confrontation clause nor state law affords the right to unlimited cross-examination. (*People v. Sully* (1991) 53 Cal.3d 1195, 1219-1220.) Trial courts retain wide latitude to impose reasonable limits on cross-examination without violating the confrontation clause to prevent prejudice and confusion of the issues or to curtail interrogation that is repetitive or marginally relevant. The confrontation clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish. (*People v. Morse* (1992) 2 Cal.App.4th 620, 642.) The ordinary rules of evidence do not compromise a defendant's right to a fair trial or to present a defense. (*Id.* at pp. 641-642.)

"To be relevant, evidence must have some 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) This definition includes evidence 'relevant to the credibility of a witness.' (*Ibid.*; see Evid. Code, § 780 [the fact finder may consider matters relevant to the truthfulness of the witness's testimony].) [¶] Conversely, a matter is 'collateral' if it has no logical bearing on any material, disputed issue. [Citation.] A fact may bear on the credibility of a witness and still be collateral to the case. [Citations.]" (*People v. Contreras* (2013) 58 Cal.4th 123, 152 (*Contreras*).)

A "trial court has wide latitude under state law to exclude evidence offered for impeachment that is collateral and has no relevance to the action. [Citations.]

13

This exercise of discretion necessarily encompasses a determination that the probative value of such evidence is 'substantially outweighed' by its prejudicial, 'confusing,' or time-consuming nature. [Citations.]" (*Contreras*, *supra*, 58 Cal.4th at p. 152.)

" ' "[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." [Citation.]' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.) Where constitutional limitations are concerned, " ' "not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance." [Citation.]' [Citation.]" (*Id.* at p. 375.)

Furthermore, "as long as the excluded evidence would not have produced a ' " 'significantly different impression' " 'of the witness's credibility, the confrontation clause and related constitutional guarantees do not limit the trial court's discretion in this regard. [Citations.]" (*Contreras*, *supra*, 58 Cal.4th at p. 152.)

Appellant argues that "[a] demonstration that McCray, the prosecution's star witness, was selling narcotics to multiple buyers would have been proper impeachment because it would have exposed her as lacking honesty and veracity and therefore lacking credibility." Furthermore, "by prohibiting [her] from exposing the details of McCray's narcotics selling, the trial court unduly restricted [her] cross-examination because the details [she] proposed to explore, if successfully proved, would have thoroughly undermined McCray's credibility. The jury would have learned that McCray was not the caring AA sponsor she purported to be, whose misdeed was at worst furthering [her] sobriety by altruistically providing her a substance for which she already had a prescription, but could no longer afford. Instead, the details of [McCray's] sales would have shown that [McCray] was more generally dealing the drug to multiple people both

14

in and out of her support group. Posing as a successfully recovering addict, while selling drugs to people trying to get sober, is so morally reprehensible that such a showing would have destroyed McCray's self-portrait of honesty."

The problem with appellant's argument is that any impeachment value the evidence had was contingent on McCray's admitting that she engaged in specific drug sales; McCray had already denied that she sold pills to anyone other than appellant.

Even if this court were to assume for the sake of argument that it was erroneous for the court to rule as it did on the scope of cross-examination of McCray, the limitation was harmless. Where the precluded cross-examination would have yielded a "significantly different impression" of a witness, the confrontation clause is implicated and the prosecution must demonstrate any error was harmless beyond a reasonable doubt within the meaning of *Chapman v. California* (1967) 386 U.S. 18, 24. (*Van Arsdall*, *supra*, 475 U.S. at p. 684 [constitutionally improper denial of a defendant's opportunity to impeach a witness is subject to *Chapman* harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt].) Otherwise, applying the *People v. Watson* (1956) 46 Cal.2d 818, 836 standard, the defense has the burden of demonstrating it is probable defendant would have received a more favorable verdict in the absence of the limitation on cross-examination. (See *People v. Franklin* (1994) 25 Cal.App.4th 328, 336-337.)

Under either the *Chapman* or *Watson* standard, any error was harmless. Although McCray's testimony was important to the prosecution, McCray was not, as appellant asserts, the prosecution's star witness. Appellant ignores the fact that Allen was the victim, not McCray. It was Allen who testified that her jewelry was missing during a specific time frame during which appellant had been in her home; it was Allen who testified that appellant had telephoned her and asked her not to report the theft to the police, or to lie to the police and not mention her name; and it was Allen who testified

15

that appellant had offered to pay restitution for the missing jewelry. Contrary to appellant's assertion, Allen's testimony was far from ambiguous.[5] McCray's testimony about appellant confessing to her about taking the jewelry was merely duplicative and corroborative of Allen's testimony. Any additional impeachment of McCray would not have weakened the prosecution's case. Accordingly, we conclude that any assumed error was harmless under *Chapman* and *Watson*.

*Disposition*

The judgment is affirmed.

---

[5]     We note that the trial court found Allen to be very intelligent and credible.

_____

ELIA, J.

WE CONCUR:



_____

RUSHING, P. J.



_____

PREMO, J.